FILED

2006 Jul-21  PM 03:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | | |
|---|---|---|
| DIANA WATSON, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.: 4:05-CV-1591-RDP** |
| | } | |
| AETNA LIFE INSURANCE | } | |
| COMPANY, | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the court are:  (i) Plaintiff's Motion for Summary Judgment (Doc. #11) filed on January 12, 2006, (ii) Defendant Aetna Life Insurance Company's ("Aetna") Motion for Summary Judgment (Doc. #14) filed on February 2, 2006, (iii) Aetna's Motion to Strike (Doc. #20) filed on February 14, 2006, and (iv) Plaintiff's Motion to Strike (Doc. #22) filed on February 20, 2006.

Plaintiff filed her Complaint in the Circuit Court of Etowah County on June 13, 2005, seeking reinstatement of disability benefits pursuant to a long term disability insurance policy insured by Aetna.  (*See generally* Doc. #1 at Compl.).   On July 26, 2004, Aetna removed the case to this court based upon federal question jurisdiction and complete preemption under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA").  (Doc. #1 at 2 § 4.b.). Plaintiff did not challenge Aetna's removal, and filed an Amended Complaint stating a claim for benefits under ERISA (Doc. #8) on November 21, 2005.

On January 12, 2006, Plaintiff filed her brief in support of summary judgment.  (Doc. #10). Aetna filed its supporting brief (Doc. #15), evidentiary submission (Doc. #16), and factual response

(Doc. #17) on February 2, 2006.  Plaintiff filed her evidentiary submission (Doc. #18) on February 6, 2006, and her reply brief (Doc. #19) on February 13, 2006.

Plaintiff filed an opposition to Aetna's Motion to Strike (Doc. #21) on February 17, 2006, and on February 22, 2006, Aetna opposed Plaintiff's Motion to Strike.  (Doc. #23).  Finally, on March 3, 2006, Aetna filed a reply in support of its summary judgment motion (Doc. #24), and the court took the motions under submission.

In addressing the parties' competing summary judgment motions, this court must determine which standard of review applies and decide whether Plaintiff is entitled to ERISA benefits as a matter of law.[1]  As discussed more fully below, the court finds that Aetna's motion for summary judgment is due to be denied, that Plaintiff's motion for summary judgment is due to be denied, and that Plaintiff's disability claim is due to be remanded to the administrator for further review consistent with this Memorandum Opinion.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate

---

[1]Because the court's role in ERISA cases is more akin to an appellate one, the scope of its review on summary judgment is notably different than when it sits as a trial court.  *See Providence v. Hartford Life & Accident Ins. Co.*, 357 F. Supp. 2d 1341, 1342 n.1 (M.D. Fla.2005) ("[T]he Court's task is to review the benefit decision based on the administrative record available to the decision maker at the time he or she made the decision.").

the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently, and in accordance with the Rule 56 standard. *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *See* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998). Also, these are the facts for summary judgment purposes only; they may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion

for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual

facts.'") (citation omitted).

## III.   STATEMENT OF FACTS

### A.   Introduction and Plan Provisions[2]

Plaintiff Diana Watson was employed by Excell Global Services, Inc. ("Excell"), as a Service

Manager, and was a participant in the Excell Global Services, Inc. Long Term Disability Plan (the

"Plan"). AF No. 1.[3]  The parties agree the Plan is governed by ERISA.  AF No. 2.  As relevant here,

under the Plan, "total disability" means:

> During the period which ends right after the first 24 months benefits are payable in
> a period of total disability:  You are not able, solely because of injury or disease, to
> perform the material duties of your own occupation; except that if you start work at
> a reasonable occupation you will no longer be deemed totally disabled.
>
> Thereafter during such period of total disability: You are not able, solely because of
> injury or disease, to work at any reasonable occupation.

AF No. 3.

---

[2]Plaintiff maintains that the pages of the Plan applicable to her claims are A0023 - A0040, and suggests that pages A0041 - A0044 were perhaps added after Plaintiff became disabled.  (Doc. #23 at 6 ¶ 1).  Contained within the disputed pages is a reference to the "Issue Date: February 13, 2001" and "Effective Date: January 1, 2001" for the Plan.  (Doc. #15 at 3 ¶ 5).

[3]The designation "AF" stands for admitted fact and indicates a fact offered by Aetna that Plaintiff has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case.  Whenever Plaintiff has adequately disputed a fact offered by Aetna, the court has accepted Plaintiff's version.  The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Aetna's Statement of Facts as set forth in Doc. #15 and responded to by Plaintiff in Doc. #23.  A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF No. 22.2) would indicate that the second sentence of paragraph 22 of Aetna's Statement of Facts is the subject of the court's citation to the record.   Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

In a section that describes the period of disability coverage, the Plan further provides as follows:

> A period of total disability will end after 24 monthly benefits are payable if it is determined that the disability is, at that time, caused to any extent by a mental condition (including conditions related to alcoholism or drug abuse) described in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association (hereafter called DSM). There are two exceptions to this rule which apply if you are confined as an inpatient in a hospital or treatment facility for treatment of that condition at the end of such 24 months.

AF No. 4.

> Regarding how to report a claim, the Plan provides in part:

> You and your employer must submit your claim to Aetna in writing on forms supplied by Aetna. Your claim must give proof of the nature and extent of the loss. Aetna may require copies of documents to support your claim, including data about any other income benefits. You must also provide Aetna with authorization to allow it to investigate your claim and your eligibility for and the amount of other income benefits.

(Doc. #16 at Ex. B at A-0036).

### B.    Plaintiff's Disability Claim

The last day that Plaintiff worked at Excell was August 20, 2001. AF No. 6. The next day, August 21, 2001, Plaintiff was seen by Dr. Gail Sacher on a referral of whether she suffered from fibromyalgia. AF No. 7. Dr. Sacher noted that "patient's overwhelming problem today is depression and anxiety." AF No. 7.

On October 2, 2001, Dr. Sacher noted "I really do not want to give her a diagnosis of fibromyalgia yet. I think there is a tremendous psychological overlay at this point." AF No. 9. On October 11, 2001, Plaintiff completed a Work History and Education Questionnaire in which she stated: "I am not capable to meet my duties and responsibilities of my job – long hours and the

5

rotational shifts, including holidays, weekends, and overnight hours.  I would break down further

taking work reports."  AF No. 10.

On October 26, 2001, Aetna awarded Plaintiff disability benefits under the Plan beginning

November 19, 2001, and continuing until November 19, 2003, so long as she remained totally

disabled from her usual occupation:

> We have reviewed your application for long term disability benefits and determined
> that you are now totally disabled from your usual occupation according to the terms
> of your group insurance coverage.  Therefore, you are eligible for monthly benefits
> starting November 19, 2001, and continuing for up to 24 months as long as you
> remain disabled from your usual occupation.

Doc. #16 at A-0557.  In this letter, Aetna also: (i) described the criteria applicable for a continuation

of benefits past November 19, 2003, by providing "objective medical evidence that you are unable

to perform any reasonable occupation" pursuant to the more strict "any occupation" standard; (ii)

indicated May 18, 2005, as the final date of Plaintiff's eligibility for long term disability; and (iii)

explained that if her disability was the result of a mental/nervous condition, coverage would be

limited to 24 months, unless she was hospitalized.  *Id.* at A-0557-58.

On December 3, 2001, Dr. Sacher again delayed making a diagnosis of fibromyalgia:  "I still

will not give her a diagnosis of fibromyalgia until her depression and anxiety are adequately treated."

AF No. 12 (emphasis added).  On March 25, 2002, Dr. Sacher provided a diagnosis of "Depression;

anxiety; myofascial neck pain; hypothyroidism" for Plaintiff.   AF No. 13; *see* Doc. #16 at A-0334.

However, by October 1, 2002, Dr. Sacher noted that "[t]his is really turning more into a

fibromyalgia-type picture."  Doc. #16 at A-0338.

Plaintiff was also treated at Adult & Child Counseling & Psychiatric Center, P.A. (the

"Center"), by Vijay Bhujang, M.D., a Board Certified Psychiatrist, and Dr. James Eaton, LMHC,

P.A.; all of the Mental Health Provider Statements from the Center[4] give Plaintiff a primary diagnosis of "DMV IV Code 296.33," which is severe recurrent major depression. AF No. 14. The Center's most recent communication to Aetna, dated August 7, 2003, and signed by Dr. Bhujang, indicated that Plaintiff "was treated for Major Depression, Recurrent and Anxiety Disorder; these diagnoses are associated with chronic pain and fatigue experienced by this patient" and "due to these diagnoses she is unable to return to her employment." AF No. 15.

By letter dated March 11, 2003, Aetna again notified Plaintiff that disability benefits for mental conditions were limited to a period of 24 months, that all medical information in Plaintiff's file indicated that her disability was due solely to a mental disorder, and that her benefits would be terminated effective November 18, 2003. Plaintiff was also notified of her right to obtain a review of the decision. AF No. 16. Again on July 29, 2003, Aetna sent Plaintiff a letter explaining that under the Plan provisions, her benefits would be limited to a period of 24 months because "review of the medical information submitted substantiating [the] disability" showed that her condition was caused or contributed to by a mental/nervous condition, and "at this time we would like to make you aware that LTD benefit payments began on November 19, 2001, and 24 months of benefit payments will have been paid on November 18, 2003." AF No. 17. The July 29, 2003 letter again informed Plaintiff that Aetna would review any additional medical information she cared to submit, such as medical information from physicians who had treated her. AF No. 18.

By letter dated September 21, 2003, Plaintiff requested extension of her LTD benefits, stating that "in reviewing my medical file, I believe that there is sufficient documentation identifying both

---

[4]The statements were dated September 17, 2001, December 27, 2001, April 17, 2002, September 24, 2002, December 17, 2002, and February 4, 2003.

physical and mental disorders." AF No. 19. Aetna was sent an Attending Physician Statement of Dr. Pedro Trujillo, dated September 2, 2003, giving Plaintiff a primary diagnosis of "myofascial neck pain/fibromyalgia" and a secondary diagnosis of "depression/insomnia" and noting "patient is depressed mostly . . . needs psychiatric input." AF No. 20.

On November 18, 2003, Aetna sent Plaintiff another letter explaining that "when your disability is the result of a mental condition as defined by your plan, benefits are limited to 24 months, unless you are hospital confined. According to the latest medical information we have, you are not hospital confined; therefore, we are terminating your claim effective November 19, 2003." AF No. 21. The November 18, 2003 letter also explained that Aetna had considered Plaintiff's claim that she was also disabled due to the condition of fibromyalgia:

> A review of your medical records show that your mental health provider indicated "fibromyalgia" on several forms, but the rheumatologist you were seeing, Dr. Gail Sacher, specifically declined to give you a diagnosis of fibromyalgia over the course of your treatment, indicating there was a "tremendous psychological overlay" and that a diagnosis of fibromyalgia would not be given until your depression and anxiety were adequately treated.

> Our Medical Consultant reviewed the record from Dr. Sacher and opined that there is no documentation of any neurologic or musculoskeletal functional impairment. There is no evidence of a physical impairment that would preclude a return to work at any functional capacity.

> The next and final record we have addressing your physical condition is an Attending Physician's Statement signed on September 2, 2003, by Pedro E. Trujillo, M.D. Dr. Trujillo, who notes that this is your initial visit with him, indicates a diagnosis of myofascial pain and fibromyalgia. He also notes that you are "depressed mostly" and need "psychiatric input." Our Medical Consultant reviewed the record of Dr. Trujillo and opined that there are no other medical records for this date which would provide documentation of impairment or abnormal physical findings in order to confirm the given diagnosis.

AF No. 22.1.  Aetna's November 18, 2003 letter explained that Plaintiff was entitled to a review of the decision if she did not agree.   AF No. 22.2.

In a letter faxed to Aetna April 23, 2004, Plaintiff's attorney requested review of the denial of benefits decision, enclosing medical records from Dr. Daniel Prince of Northeast Orthopedic Clinic, P.C.  AF No. 23.  The medical opinions from Dr. Prince, dated February 19, 2004, February 26, 2004, April 7, 2004, and April 14, 2004, indicated that Dr. Prince had diagnosed Plaintiff with "severe fibromyalgia  . . . that definitely keeps her from being employed."  AF No. 24.  By letter dated July 23, 2004, Aetna responded to Plaintiff's appeal of the denial of benefits:

> According to the information in our records, Ms. Watson ceased work on August 20, 2001 due to symptoms related to depression.  She received Long Term Disability (LTD) benefits for 24 months (November 19, 2001 through November 19, 2003). In accordance with the Excell Global Services Incorporated disability policy Ms. Watson's claim was terminated on November 20, 2003.  The policy states "a period of total disability will end after 24 monthly benefits are payable if it is determined that the disability is, at that time, caused to any extent by a mental condition . . . ." Please review the applicable policy provision enclosed for your review.

> We received your appeal request, on behalf of Ms. Watson, in our office April 26, 2004.  Enclosed were medical records from Dr. Prince to support that Ms. Watson remains disabled due to "severe fibromyalgia . . . chronic pain problems that are fairly typical of this disorder."

>  . . .

> Our Medical Director, Dr. Taiwo, board certified in Internal and Occupational Medicine, opined that given the minimal findings on her physical examinations, unremarkable results of diagnostic tests and lack of documentation of any specific physiologic loss of function or impairment, there was no objective evidence provided to indicate that Ms. Watson is physically incapable of performing in a sedentary work capacity or any other occupation. . . .

> While we certainly considered Dr. Prince's opinion but in light of the lack of clinical evidence to support his stated restrictions, we are unable to reverse the original decision and Ms. Watson's claim will remain closed.

AF No. 25.

## IV.   ANALYSIS

### A.   ERISA Standard Of Review

The first question the court must answer in addressing the parties' cross motions for summary judgment is what standard of review applies here.  In *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004), the Eleventh Circuit set forth a six-step model for use in judicially reviewing virtually all ERISA denials:

(1)   Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision; if it is not, then end the inquiry and affirm the decision).

(2)   If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)   If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)   If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)   If there is no conflict, then end the inquiry and affirm the decision.

(6)   If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams,* 373 F.3d at 1138 (footnotes omitted).  As this excerpt from *Williams* makes clear, the Eleventh Circuit has crafted a "modified" or heightened standard of review in an effort to account for a possible conflict of interest that a fiduciary may have in making a claims determination.  *See*

*Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1159, 1562-63 (11th Cir. 1990), *cert. denied*, 498 U.S.1040 (1991).  According to *Brown*, under the modified arbitrary and capricious standard, the first step is to determine – *de novo* – whether the fiduciary's interpretation of the disputed contract provision was legally correct or legally wrong. *Brown*, 898 F.2d 1556, 1567 n.12. If the court determines that the interpretation advanced by the fiduciary is legally correct, there is no need for further consideration of a possible conflict of interest.  *See HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993-94 (11th Cir. 2001); *Yochum v. Barnett Banks, Inc. Severance Pay Plan*, 234 F.3d 541, 544 (11th Cir. 2000) ("It is important to note that where the district court agrees with the ultimate decision of the administrator, it will not decide whether a conflict exists."); *Adams v. Thiokol Corp.*, 231 F.3d 837, 843 (11th Cir. 2000); *Collins v. American Cast Iron Pipe Co.*, 105 F.3d 1368, 1370 (11th Cir. 1997) ("If the administrator's interpretation was correct, then the inquiry ends.").  But, if the court concludes *de novo* that the claims administrator's decision is wrong, it must follow the remaining steps of the model and decide which standard of review is appropriate.

Plaintiff asserts that the court should use a heightened arbitrary and capricious standard of review.  In support of that position, Plaintiff points out that Aetna both administers and insures the ERISA benefits plan at issue here.  Thus, Plaintiff contends this fact brings this case squarely within the language of *Brown* which recognized "the inherent conflict between the fiduciary role and the profit making objective of an insurance company."  *Brown v. Blue Cross and Blue Shield of*

*Alabama*, 898 F.2d at 1562.  Aetna agrees with Plaintiff that the modified arbitrary and capricious standard applies.[5]

For reasons explained more fully below, the court concludes that Aetna's decision to deny benefits does not survive heightened arbitrary and capricious scrutiny.  Alternatively, even under the more deferential arbitrary and capricious review, the court concludes no reasonable grounds exist to support Aetna's decision; therefore, its benefits determination is arbitrary and capricious under even the most deferential standard of review.

     **B.**    **Was Aetna's Decision Denying Benefits Wrong When Reviewed On A**
              **_De Novo_ Basis?**

Under *Williams*, regardless of which standard of review applies (*i.e.,* arbitrary and capricious or heightened arbitrary and capricious), the court's initial task is the same.  It must, in the first instance, review on a *de novo* basis whether Aetna's decision to deny Plaintiff's claim for disability benefits based upon her assertion that she suffered an asserted physical disability (fibromyalgia) was correct.  This first step calls for the court to decide whether it agrees or disagrees with the claims administrator's benefits-denial decision.  If the court determines that the administrator's decision is correct, then summary judgment is due to be entered in favor of Aetna.  However, if the court disagrees with Aetna's decision, then it must decide the level of discretion that should be afforded

---

[5]By way of an email message to the court on May 25, 2006, counsel for Aetna confirmed that the heightened arbitrary and capricious standard of review applies.  In its briefing, Aetna did not directly respond to Plaintiff's argument; instead Aetna merely maintained that its benefits decision was correct, and therefore should be affirmed by this court.

to the administrator in reviewing Plaintiff's claim, and proceed to apply the correct standard of review based upon that level of discretion.[6]

> **1.    Every Doctor Who Saw Plaintiff Either Diagnosed Her as Suffering from Fibromyalgia or Believed it Probable that She Was Suffering from its Effects**.

Plaintiff sought treatment for her physical condition from three different physicians: Dr. Gail Sacher; Dr. Pedro Trujillo; and Dr. Daniel Prince.  The diagnoses of Drs. Trujillo and Prince are quite clear.  Dr. Trujillo indicated a primary diagnosis of myofascial pain and fibromyalgia.  Similarly, Dr. Prince diagnosed Plaintiff with "severe fibromyalgia . . . that definitely keeps her from being employed."  AF No. 24.  Dr. Sacher, who was the first physician to see Plaintiff (and perhaps employed the most conservative approach in treating and diagnosing her), delayed making a diagnosis of fibromyalgia until Plaintiff's depression and anxiety were adequately addressed.  Thus, in 2001 and 2002, Dr. Sacher did not assign such a diagnosis to Plaintiff while she was being treated for depression.  However, after seeing Plaintiff in October 2002, Dr. Sacher stated that "[t]his is really turning more into a fibromyalgia-type picture."  Doc. #16 at A-0338.  Thus, of the three physicians who treated Plaintiff for her physical condition, two diagnosed her as suffering from fibromyalgia from the beginning of treatment and the other, after conservatively evaluating Plaintiff for several years, indicated a belief that Plaintiff's symptoms were pointing to a fibromyalgia problem.

---

[6]If the administrator is not vested with discretion in reviewing claims, a court's *de novo* conclusion that the claim decision is wrong ends the judicial inquiry and results in a reversal of the benefits determination.  On the other hand, if the administrator is vested with discretion, which is the case here, the court must conduct further analysis of the claim and determine whether reasonable grounds exist to support the benefits decision, and if so, whether a potential conflict of interest exists and whether that conflict makes a difference in the discretion otherwise afforded to a defendant.

After Plaintiff had received a diagnosis of severe fibromyalgia from one of her treating physicians (Dr. Prince) subsequent to the expiration of the 24 month period of the mental illness limitation, Aetna referred Plaintiff's claim for a paper review by a consulting physician, Obyebode A. Taiwo, M.D.[7]  Although Dr. Taiwo's actual assessment of Plaintiff's medical history is not part of the administrative record, Aetna's summary of his review is as follows:  "Our Medical Director, Dr. Taiwo, board certified in Internal and Occupational Medicine, opined that given the minimal findings on her physical examinations, unremarkable results of diagnostic tests and lack of documentation of any specific physiologic loss of function or impairment; there was no objective evidence provided to indicate that Ms. Watson is physically incapable of performing in a sedentary work capacity or any other occupation."  AF No. 25.

The court is not persuaded by Dr. Taiwo's assessment and finds it to be inconsistent with the medical evidence provided by Plaintiff to the Claims Administrator.  Even prior to Dr. Prince's diagnosis, none of Plaintiff's other treating physicians expressly concluded that: (1) Plaintiff did not suffer with fibromyalgia or (2) depression was the sole cause for Plaintiff's inability to work.  Dr. Trujillo had previously diagnosed Plaintiff as having fibromyalgia in 2003.  Further, Aetna's denial is not supported by any finding of Dr. Sacher.  Although she suggested a course of treatment that

---

[7]Dr. Prince also indicated that Plaintiff is incapable of working due to her having "severe fibromyalgia."  Aetna argues that Dr. Prince's opinion is irrelevant because it relates to a diagnosis in 2004, and not to one in 2003.  (Doc. #15 at 22).  However, merely because Dr. Prince did not comment upon Plaintiff's condition in 2003 (as he was treating her in 2004) does not mean that Plaintiff did not have fibromyalgia in 2003.  Moreover, Dr. Pedro Trujillo diagnosed Plaintiff with the primary condition of fibromyalgia in 2003, and as discussed *infra*, Dr. Sacher believed in October 2002 that the picture presented by Plaintiff's condition "was turning more into" a fibromyalgia diagnosis.  The court finds from the undisputed evidence that Plaintiff suffered from fibromyalgia in 2003 when she was diagnosed by Dr. Trujillo and that she continued to suffer form that condition into 2004 when she was seen by Dr. Prince.

called for the treatment of Plaintiff's depression, and indicated at one point that her "overwhelming" or primary concern in August of 2001, nothing in the record suggests that Dr. Sacher believed Plaintiff's depression was caused by anything other than physical pain. Moreover, the collection of doctors that treated Plaintiff at the Center gave her a primary diagnosis[8] of severe recurrent major depression and concluded that she was unable to return to her employment. Dr. Vijay Bhujang, Plaintiff's psychiatrist, diagnosed Plaintiff with major depression. Significantly, he also found that her depression was associated with the chronic pain and fatigue she was experiencing. (Doc. #16 at Ex. C at A-3190). Thus, even Dr. Bhujang's findings indicate that Plaintiff's mental depression was due to her suffering from chronic pain.

Plaintiff continued to see Dr. Sacher periodically throughout her initial period of disability under the Plan. In October 2002, Dr. Sacher made the following primary assessment of Plaintiff: "1) myofascial neck pain/fibromyalgia: This is really turning more into a fibromyalgia-type picture. . . ." (Doc. #16 at Ex. C at A-0478). Therefore, Plaintiff's prior medical history, as documented by her treating physicians, is entirely consistent with Dr. Prince's and Dr. Trujillo's diagnoses of fibromylagia. Taken as a whole, the medical evidence in the record suggests that, contrary to Dr. Taiwo's assessment, Plaintiff suffered from fibromyalgia that rendered her unable to work and caused her to be depressed.

---

[8]Of course, a primary diagnosis does not exclude a secondary or dual diagnosis—indeed, if anything, the use of the word "primary" implies the interplay of other conditions. In fact, as already noted, the doctors at the Center referred to Plaintiff's associated "chronic pain and fatigue." Chronic pain and fatigue and fibromyalgia share common characteristics as physical medical conditions.

**2.      Aetna's Denial of Benefits is De Novo Wrong for Two Reasons:  (a)  It Improperly Relied Upon Plan Language to Limit Plaintiff's Claim to One for a Mental Disability, and (b) It Improperly Required Objective Evidence of Plaintiff's Disability.**

Against that factual backdrop, the court finds that Aetna's decision denying Plaintiff disability benefits is wrong for two reasons.  First, the Plan language relied upon by Aetna to limit Plaintiff's disability claim does not support its position.  Second, Aetna's requirement that Plaintiff put forth objective evidence of her physical disability is equally unsupported.

**a.      Aetna's Reliance Upon the Plan's Language to Limit Plaintiff's Disability Claim to One for Mental Disability Is Off the Mark.**

Aetna denied Plaintiff's claim at least in part based upon its reliance upon the following Plan language: "24 monthly benefits are payable if it is determined that the disability is, at that time, caused to  any extent by a mental condition[.]"  The Eleventh Circuit has not yet addressed how a court should review this type of language, particularly in light of Plaintiff's asserted condition of fibromyalgia and her contention that she suffers from a dual or wholly separate period of disability based upon a diagnosis of fibromyalgia.[9]  Aetna urges the court to conclude that because Plaintiff is unable to show that "her disability was not caused to any extent by a mental condition[,]" the court should uphold Aetna's decision denying benefits as a matter of law.  (*See, e.g.*, Doc. #16 at 8).  The

---

[9]This case is factually and legally distinguishable from *Blake v. Unionmutual Stock Life Ins. Co.*, 906 F.2d 1525, 1526-27 (11th Cir. 1990), in which the Eleventh Circuit upheld a district court's determination that a mental illness limitation is enforceable when a plaintiff is unable to show that her illness had a physical cause.  In *Blake*, the plaintiff, who suffered from postpartum depression, argued that her condition should fall within the "sickness" portion of the plan and should not be classified as falling under the mental illness limitation of the plan.  *Id.*  In this case, however, Plaintiff has presented evidence of a separate physical condition.

16

court rejects this argument for two reasons.  First, as discussed above, the undisputed evidence before the court shows that any fair reading of the record demonstrates that every *treating* doctor either diagnosed her as having fibromyalgia or believed it probable that she was suffering from the effects of fibromyalgia.  Second, the court finds that the Plan language relied upon by Aetna to support its argument is, at best, ambiguous, and in any event, the court is unwilling to adopt Aetna's hyper-technical interpretation of the "mental illness limitation" language and determines that Aetna's denial of benefits based upon such a narrow reading of the Plan is *de novo* wrong.

The court has already explained the basis for its conclusion that the record undisputedly shows Plaintiff suffered from fibromyalgia, a *physical* condition that doctors have said caused her to be unable to work.  Regarding the ambiguity issue, the court's conclusion finds support in the case of *Luton v. Prudential Ins. Co.*, 88 F. Supp. 2d 1364 (S.D. Fla. 2000).  There, the district court declined to enforce a mental illness limitation in light of evidence of a physical cause.  *Luton*, 88 F. Supp. 2d at 1371 ("The court finds that as a matter of law, the definition of "mental, psychoneurotic or personality disorder" is ambiguous, and that plaintiff has presented a reasonable interpretation of the terms.").  The plaintiff in *Luton* "argue[d] that a disability caused by depression is not a disability due to a 'mental, psychoneurotic or personality disorder' as defined in the policy because [of the assertion that] depression is caused by a chemical imbalance that is organically or physically based." 88 F. Supp. 2d at 1371.  Similar to *Luton*, the court finds that the term "mental condition" contained in the Aetna Policy is ambiguous, and that, as a matter of law, the mental condition limitation does not apply to a claimant potentially suffering from dual conditions (or separately disabling conditions) of depression and a physical disability, such as fibromylagia, which may very well be the source of (or a contributing factor to) the person's depression.[10]

---

[10]Additionally, the court is not at all clear about the meaning of the ambiguous phrase "at that time" as it pertains to the temporal scope of the mental illness limitation.  Does "at that time" relate

Aetna relies upon two cases from the Southern District of New York for the proposition that the "caused to any extent by a mental condition" language applies to Plaintiff, but neither of these cases support Aetna's position here. *See Bergquist v. Aetna U.S. Healthcare*, 289 F. Supp. 2d 400, 412 (S.D. NY 2003) ("Since plaintiff received 24 months of benefits because she was medically certified as having certain mental disorders [*i.e.*, post traumatic stress disorder]-and only revised her claim to encompass Lyme disease when those benefits ran out-I am hard-pressed to see how Aetna acted arbitrarily and capriciously in concluding that her condition was caused at least in part by her mental health issues[.]"); *Reid v. Aetna Life Ins. Co.*, 393 F. Supp. 2d 256, 261-62 (S.D. NY 2005) ("On April 10, 2001, Defendant conducted a review of the file, and found Plaintiff disabled, subject to the mental/nervous policy limitation. At that time, investigators considered whether the Plaintiff's heart condition was a separate cause of total disability, which would have avoided the 24-month cap. However, further investigation found that the condition was not disabling.") (citations omitted). The court finds these cases are inapposite because they do not involve (1) a diagnosis of fibromylagia, or (2) the treatment of a dual disabling condition and/or a separate period of a physical disability.[11]

---

to only the status of claimant's medical condition at the end of the 24-month period, at the beginning of the 24-month period, or at any time within the 24-month period?  Similarly, if a claimant suffers from a physical disability for 23 months, and in the last day of the last month of the 24-month period, the person also suffers with depression, does the mental illness limitation apply because a portion, *i.e.*, the last day, of the disabled period was caused by a mental illness? These are examples of questions that the Defendant's characterization of the policy language leaves unanswered.

[11]With respect to item (2), the *Reid* case points out that the administrator reviewed the claimant's heart condition to see if it qualified as a separate cause of total disability under the plan. From that standpoint, the *Reid* opinion actually supports this court's *de novo* conclusion that Plaintiff's fibromylagia is subject to an independent assessment as a physically disabling condition regardless of the "mental disorder limitation" language in the Plan.

The court's conclusion is also consistent with Aetna's handling of the diagnosis in this case record. For example, in denying Plaintiff's appeal on July 23, 2004, Aetna indicated that its decision was based upon "no objective evidence provided to indicate that Ms. Watson is physically incapable of performing in a sedentary work capacity or any other occupation."  Aetna further stated that "[w]hile we certainly considered Dr. Prince's opinion but in light of the lack of clinical evidence to

In summary, the court finds that Aetna has engaged in a tortured reading of the Plan language at issue.  Under such a reading, even if Plaintiff suffered a catastrophic physical injury or illness that, in and of itself, would have caused her to be disabled under the Plan language, her benefits would be limited to 24 months if that same injury or illness caused her to be depressed and her disability was caused to any extent by that mental condition (*i.e.*, depression).  The court rejects such a parsed reading of the Plan language and finds from the undisputed facts that Plaintiff's physical condition — her chronic pain and fatigue caused by fibromyalgia — caused her disability.

> **b.    Aetna Improperly Required Plaintiff to Present Objective Evidence of Her Physical Disability.**

One of the reasons provided by Aetna for denying Plaintiff's disability claim beyond the 24 months paid was its conclusion that "there was <u>no objective evidence</u> provided to indicate that [she was] physically incapable of performing sedentary work capacity or any other occupation."  AF No. 25 (emphasis added).  Aetna further explained that it had "considered Dr. Prince's opinion but in

―――――――――

support his stated restrictions, we are unable to reverse the original decision and Ms. Watson's claim will remain closed."

Similarly, in the initial award of benefits letter of October 26, 2001, Aetna described the criteria necessary for the continuation of benefits, and never indicated that Plaintiff's disability due to depression necessarily precluded her from receiving disability benefits beyond the 24-month period.  Put differently, if the mental illness limitation contained in the Plan was indeed a complete bar against Plaintiff's efforts to seek additional disability benefits due to a physical disability, then Aetna would have had no reason to address Dr. Prince's records, or the lack of any objective medical evidence to support Plaintiff's claim of fibromyalgia.

Under the Plan, "[o]nce a period of total disability has ended, any new period of disability will be treated separately." (Doc. #16 at Ex. B at A-0028).  Therefore, it appears from the record that Aetna regarded Plaintiff's first period of total disability ending on November 19, 2003, and that Dr. Prince's diagnosis of severe fibromyalgia in 2004 potentially started a new period of disability under the Plan.  Alternatively, it appears that Aetna recognized the potential for a claimant, such as Plaintiff, to have a dual disability status under the Plan.

light of the <u>lack of clinical evidence</u> to support his stated restrictions, we are unable to reverse the original decision and [Plaintiff's] claim will remain closed."  *Id.* (emphasis added).

The court is aware that several courts have drawn a distinction between requiring objective evidence to support a diagnosis of fibromyalgia versus objective evidence of physical incapabilities due to a diagnosis of fibromyalgia.  *See Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n. 5 (1st Cir. 2003) ("While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."); *see also Ecklund v. Continental Cas. Co.*, 415 F. Supp. 2d 1353, 1372 (N.D. Ala. 2005) ("The court recognizes that a fibromyalgia sufferer will not always be able to present objective evidence to support all of her symptoms, and that resulting difficulties may sometimes arise in the pursuit of disability benefits.  Nonetheless, plaintiff has presented no authority that would allow the court to disregard a plan term requiring objective medical evidence whenever a claimant suffers from a condition which does not readily lend itself to objective identification.").  In summarizing this differentiation, another district court explained:

> A few guiding principles are evident from the case law. If the denial of [a plaintiff's] claim is based on the lack of objective medical evidence of disease, which a claimant with CFS would typically be unable to provide, it would run afoul of the courts' recognition that it is arbitrary and capricious for a plan to require objective evidence of the etiology of CFS, when it is widely recognized that there is no conclusive laboratory test for CFS. If the denial of [a plaintiff's] claim is based on the lack of substantial objective medical evidence of symptoms or their affect on her ability to work, . . . that would be consistent with opinions upholding insurers' denials of long-term disability benefits.

*Karvelis v. Reliance Standard Life Ins. Co.*, No. Civ. A. H-03-3848, 2005 WL 1801943 (S.D. Tex. July 28, 2005), at *15.  This case law suggests that a denial of benefits based upon the lack of objective evidence for a condition like fibromyalgia, for which conclusive evidence is often elusive, is suspect.

Moreover, as pointed out by the *Ecklund* court, there is non-binding authority, which finds error in an administrator's denial of a disability claim relating to the condition of fibromyalgia or chronic fatigue for lack of supporting objective medical evidence, when the plan, like the one in this case, does not explicitly require the submission of objective medical evidence to prove a disability claim:

> The court is mindful of non-binding case law supporting the proposition that the administrator of a plan which does not explicitly require objective medical evidence as proof of loss to support a disability claim should not require such evidence from a claimant who suffers from a condition, such as fibromyalgia or chronic fatigue, which is comprised primarily of a patient's subjective symptoms. *See, e.g., Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 442-43 (3rd Cir.1997) (holding that it was error for a plan administrator to require the claimant to submit clinical findings to support his diagnosis of chronic fatigue syndrome, when the plan did not require such evidence); *Mason v. Hartford Life and Accident Insurance Co.*, No. 02-10067-CIV, 2004 WL 2674352, at *4 (S.D. Fla. August 31, 2004) (holding that it was wrong for an administrator to require a claimant suffering from fibromyalgia and chronic fatigue syndrome to submit objective medical evidence in support of her claim for benefits, when the plan did not require such evidence).

> However, plaintiff has cited no authority, and the court has found none, to prohibit an administrator from requiring objective medical evidence when the plan states such evidence will be required.  Indeed, other district courts within this circuit have held that, when a plan requires objective medical evidence, the administrator can rely on a lack of such evidence to support a finding of no disability, even when the claimant suffers from a condition such as fibromyalgia. *See, e.g., Stenner-Muzyka*, 2005 WL 1610708, at *5-*6 (disability determination could not be based on a claimant's "self-reported symptoms").

*Ecklund*, 415 F. Supp. 2d at 1372 n.143.  While this court does not believe that the absence of an express objective evidence term is necessarily outcome-determinative as urged by Plaintiff, *see, e.g.*, Doc. #10 at 9-10 and related cases, the language of the Plan regarding evidence is a relevant factor for the court to consider in conducting its *de novo* analysis.

Given the evidence in the record regarding Dr. Trujillo's and Dr. Prince's separate diagnoses of severe fibromyalgia (including a substantiating physical capacity evaluation of Plaintiff), *see* Doc. #16 at Ex. C at A-0382, A-0384, A-0379, A-0380, the absence of any evidence suggesting Plaintiff

did not suffer from that condition, and Plaintiff's overall medical history (including multiple references to fibromyalgia as part of Plaintiff's condition by various treating physicians), and the lack of an express Plan term requiring proof of a disability by way of objective medical evidence, Aetna's denial of Plaintiff's physical disability claim because of a lack of objective evidence to support her disability claim based upon a diagnosis of fibromyalgia is *de novo* wrong. *See, e.g., Levinson*, 245 F.3d at 1326-27 (outlining circumstances under which insurer's denial of disability claim is *de novo* wrong). As observed by the Eleventh Circuit in *Levinson*:[12]

> It appears, therefore, that Reliance relied on the nurse's review and the opinion of its claim person that Levinson was asymptomatic and not disabled, and not upon any independent medical evidence to conclude that Levinson did not meet the definition of disabled. Furthermore, Reliance's assertion that Levinson was asymptomatic does not appear to be a reason for denying benefits anywhere in the language of the policy.

245 F.3d at 326 (footnote omitted). Similarly, Aetna's paper review decision to deny Plaintiff's disability claim because of a lack of objective evidence of fibromyalgia despite (i) Plaintiff's having a history of treating physicians identify fibromyalgia as a secondary source of her medical condition, and (ii) Plaintiff's being diagnosed by her treating physician, Dr. Prince, as having an extreme case of fibromyalgia, which prevented her from being employed, is incorrect.[13]

---

[12]The court's reference to *Levinson* is to illustrate appropriate *de novo* assessment when a claimant has produced evidence of a disabling condition. The court agrees with Aetna that the burden remains with Plaintiff to show that she is disabled and the past payment of benefits does not shift the burden of proof away from her.

[13]Aetna cites *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), as authority supportive of its decision to deny Plaintiff's disability claim. (Doc. #15 at 24 ("Under *Nord*, Aetna's reliance on the independent consulting physician is acceptable as a matter of law and Aetna correctly determined that Plaintiff was not disabled.") (citation omitted)). The *Nord* opinion stands for the general principle that the so-called treating physician rule, as developed for review of disability claims under the Social Security Act, 42 U.S.C. § 231 *et seq*., and subsequently adopted by the Commissioner of Social Security, does not apply in ERISA cases. In other words, under ERISA, a plan administrator need not give special deference to the opinions of treating physicians. The Supreme Court made clear that the nature of its review on certiorari was limited to only the application of the treating physician rule "given the division among the Circuits[.]" *Nord*, 538 U.S. at 828, 829 n.2 ("We express no opinion on any other issues.").

C.   **The Proper Standard In This Case Is The Heightened Arbitrary And Capricious Standard And Aetna Cannot Satisfy That Test.**

Because it is undisputed that Aetna operates under a conflict of interest, the heightened arbitrary and capricious standard of review applies to the denial of Plaintiff's claim.  *See, e.g., Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1326 (11th Cir. 2001) ("Because Reliance pays out to beneficiaries from its own assets, however, a conflict of interest exists between its fiduciary role and its profit making role. Thus, the proper standard in this case is a heightened arbitrary and capricious standard.").  Aetna cannot satisfy that test on this record.

Under the heightened arbitrary and capricious standard, "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries."  *Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1566-67 (11th Cir.1990).  In *Williams*, the Eleventh Circuit noted that it had "described 'heightened arbitrary and capricious review'[] as somewhere

---

Moreover, in *Nord,* "[d]uring the MetLife review process, Black & Decker referred Nord to neurologist Antoine Mitri for an independent examination. Dr. Mitri agreed with Nord's doctors that Nord suffered from a degenerative disc disease and chronic pain. But aided by pain medication, Dr. Mitri concluded, Nord could perform 'sedentary work with some walking interruption in between.'" 538 U.S. at 827.  After the results of this independent examination,  MetLife made a final recommendation to Black & Decker to deny Nord's claim, which Black & Decker did.  *Id.*  While Aetna attempts to liken Dr. Taiwo's review with that of Dr. Mitri in the *Nord* case, (i) Dr. Taiwo saw only Plaintiff's medical records, while Dr. Mitri, examined the claimant Nord personally, and (ii) Dr. Taiwo is referred to by Aetna as "our Medical Director," while Dr. Mitri, is a doctor to whom Black & Decker referred Nord, for the purpose of conducting an independent medical examination. (Doc. #16 at Ex. C at A-0394).

Furthermore, this court's determination that Aetna's denial of disability benefits is *de novo* wrong, does not turn upon either a direct or indirect application of the treating physician rule. Instead, the decision is based upon its review of the entire administrative record, including the relevant Plan language, the undisputed facts in this case, and case law from other courts.

between the *de novo* and 'mere' arbitrary and capricious standards."[14]   373 F.3d at 1138.   In *Williams*, the court reserved the question of whether this same framework would apply equally to factual determinations.   *Id.* ("[H]ence, we leave the issue to another day, but proffer the above framework to assist future determinations[.]") (footnote omitted).

In this case, the court is faced with two issues of Plan interpretation: whether (i) the application of the mental disorder limitation bars recovery for any additional disability benefits, and (ii) whether objective evidence of an inability to perform sedentary work because of fibromylagia is required.   As for item (i), Aetna's interpretation of the Plan would appear to obviate any need for an administrative factual determination as to Plaintiff's claimed disabled status based upon fibromylagia; as for (ii), Aetna's interpretation of the Plan resulted in a factual determination that Plaintiff was not disabled under the Plan.

---

[14]In describing heightened arbitrary and capricious review, the Eleventh Circuit has explained:

> Our circuit, at least in plan *interpretation* cases (unlike this, a *factual determination* case), has incorporated a two step, burden-shifting, approach:
>
> (1) The claimant shows that the administrator of a discretion-vesting plan is conflicted.
>
> (2) The administrator then proves that his plan interpretation was not tainted by self-interest.

*See Brown*, 898 F.2d at 1566.

> A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the claimant. *Id.* at 1566-67. But, if the administrator can demonstrate a routine practice or give other plausible justifications-such as benefitting the interests of other beneficiaries-judicial deference to it may be granted, since "[e]ven a conflicted [administrator] should receive deference when [he] demonstrates that [he] is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries." *Id.* at 1568.

*Williams*, 373 F.3d at 1138.

In applying the above heightened arbitrary and capricious framework to these interpretations, Aetna has failed to meet its burden — it has not even addressed, much less demonstrated to the court, a routine practice or given some other plausible class-wide justification for its decision to deny benefits.  Moreover, Plaintiff's interpretation of the Plan is reasonable.  Accordingly, summary judgment in favor of Aetna under the modified arbitrary and capricious standard is inappropriate. At the same time, because the record fails to indicate full consideration of Plaintiff's disability claim based upon fibromyalgia,[15] summary judgment in favor of Plaintiff is also not warranted at this time. As a result, the court concludes that the proper remedy is a remand of Plaintiff's claim to the administrator for further review consistent with this Memorandum Opinion.[16]

### D.   Cases Decided Under The Pure Arbitrary And Capricious Standard Lend Support To The Court's Decision.

Similar cases applying the most deferential standard of review lend support to the court's decision on summary judgment.  For example, in *Howell v. Continental Casualty Co.*, *et al.*, 4:99-CV-1842-RBP (N.D. Ala. Dec. 20, 1999) (Doc. #23), Judge Robert B. Propst of this court utilized the most deferential standard of review and determined that an administrator acts arbitrarily and capriciously when it denies a claim solely on the lack of objective evidence when an "insured suffers from a recognized debilitating disease which is commonly known to defy quick and easy diagnosis, which has no 'dipstick' test, and which regularly baffles physicians by its impairing symptoms in light of unremarkable medical test results."  (Doc. #23 at 13-14).  As to the argument that the issue

---

[15]For example, the administrator has not addressed the physical capacity evaluation of Plaintiff conducted by Dr. Prince, which would appear to satisfy even the objective medical evidence of an inability to work espoused by Aetna.

[16]On remand, Plaintiff should also focus her attention on providing information that shows her fibromyalgia caused her to be unable to work.

for the court was not whether the claimant suffered from the condition, but rather whether objective evidence existed to prove that the condition prevented her from working, Judge Propst wrote:

> Defendants assert that this case is not about whether Howell has or had CFS, but whether she was able to work during the Elimination Period (February 2, 1998 - July 1, 1998). Defendants claim that the objective medical evidence presented to them did not support the conclusion that she could not work during the time frame. <u>This is a distinction of no matter.</u> Defendants argue that they want hard evidence of an inability to work, *i.e.* objective medical evidence. As previously discussed, sufferers of CFS regularly cannot provide that type of evidence. However, that does not necessarily translate into an ability to work.

(Doc. #23 at 14) (emphasis added).

While the particular diagnosis attributable to Plaintiff (*i.e.*, fibromylagia) may differ from chronic fatigue syndrome ("CFS"), the logic of *Howell* still applies – how can an administrator reasonably require only objective evidence of a physical disability when the claimant's condition, by its very nature, is ill-suited for objective medical measurement in terms of diagnosis as well as vocational assessment? That a claimant failed to provide objective medical evidence that she could not work during the time frame (as opposed to objective evidence of the fibromyalgia diagnosis), is a distinction without a difference in this case because the administrator failed to properly consider whether Plaintiff had a disability based upon her physical symptoms.

In another CFS disability case, the court summarized, "CNA found the objective medical documentation did not support Ms. Gawrysh's claim that she was 'continuously unable to perform the substantial and material duties of [her] regular occupation.'" *Gawrysh v. CNA Ins. Co.*, 8 F. Supp. 2d 791, 793 (N.D. Ill.1998). In denying CNA's motion for summary judgment and granting the plaintiff's, the court reasoned and later concluded:

> CNA did not deny Ms. Gawrysh's symptoms existed or had a debilitating effect, but concluded that because the symptoms could not, with complete certainty, be linked to a specific illness, Ms. Gawrysh was not totally disabled. The uncontroverted evidence indicates Ms. Gawrysh's symptoms were debilitating and were consistent with a diagnosis of Chronic Fatigue Syndrome. Rather than punishing Ms. Gawrysh

for the inability of medicine to specifically pinpoint the cause of her debilitating fatigue, CNA should have hired experts or used its own doctors to examine Ms. Gawrysh to determine the cause and degree of her fatigue. CNA simply denied benefits. . . .

There is an abundance of uncontroverted evidence that Ms. Gawrysh suffers from a debilitating fatigue. CNA chose to ignore this evidence and found, since it was unclear whether Ms. Gawrysh's fatigue was due to Chronic Fatigue Syndrome or chronic sinusitis, that Ms. Gawrysh must not be totally disabled. If CNA doubted the legitimacy of Ms. Gawrysh's claims, it should have had outside experts examine Ms. Gawrysh and attempt to pinpoint the severity and cause of the fatigue. It did not. Instead, CNA utilized a Disability Specialist, Joye Kelly, who the record suggests had no medical training or experience with fatigue to review Ms. Gawrysh's medical records. CNA acted arbitrarily and capriciously in finding Ms. Gawrysh was continuously able "to perform the substantial and material duties of [her] regular occupation."

*Gawrysh*, 8 F. Supp. 2d at 794, 796.

A final instructive case, *Hufford v. Harris Corporation*, 322 F. Supp. 2d 1345 (M.D. Fla. 2004), recognized that while an administrator's requiring objective medical evidence may be reasonable in most cases, exceptions to this general rule exist for those conditions that are "difficult to diagnose and document." 322 F. Supp. 2d at 1356. In its analysis, the *Hufford* court explained that conditions of CFS and fibromylagia are distinguishable from other types of disability claims. *Id.* at 1356-57. Regarding fibromylagia specifically, the *Hufford* court noted:

Cases involving claims of disability based upon fibromylagia would likewise be distinguishable based upon the difficulty associated with diagnosing and documenting fibromylagia. As explained by the Seventh Circuit in *Hawkins v. First Union Corporation Long-Term Disability Plan*:

[F]ibromyalgia, "also known as fibrositis [is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots . . . ."

326 F.3d 914, 916 (7th Cir.2003) (quoting *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir.1996)).

322 F. Supp. 2d at 1357 n.3.

Therefore, even under the least stringent standard of review, Aetna's denial of Plaintiff's disability benefits claim due to a lack of objective evidence of fibromylagia fails as a matter of law.[17] Similarly, as outlined earlier, Aetna's denial of Plaintiff's disability claim based upon a strained application of the Plan's mental disorder limitation is inconsistent with its treatment of the claim as a separate or dual disability during the administrative process and is unreasonable. Accordingly, Aetna's Motion for Summary Judgment is due to be denied on this alternative basis.

## V.    CONCLUSION[18]

For the reasons stated above, neither party has met the burden of demonstrating the absence of material disputed facts and entitlement to judgment as a matter of law. Accordingly, the court will enter an order denying Aetna's and Plaintiff's motion for summary judgment, and remanding Plaintiff's disability claim to the administrator for further review that is consistent with this Memorandum Opinion.

---

[17]As noted in *Hudson*, several courts of appeals have recognized that an administrator's insistence upon objective evidence may also be unreasonable in cases involving a diagnosis of CFS. 322 F. Supp. 2d at 1356 (citing *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir.1997), and *Cook v. Liberty Life Assurance Co. of Boston*, 320 F.3d 11 (1st Cir. 2003)); *see also Sisco v. U.S. Dept. of Health and Human Servs.*,10 F.3d 739, 744 (10th Cir. 1993) ("The ALJ's and the district court's reading of § 223(d)(5)(A) of the Social Security Act would mean that chronic fatigue syndrome, and other disabilities that cannot be diagnosed with a 'dipstick,' could never be recognized as disabilities under the Act.").

[18]The nature of the court's decision on summary judgment does not require it to reach the other arguments raised by the parties, including those issues presented in their motions to strike. Accordingly, the court will enter an order denying them as moot.

**DONE** and **ORDERED** this _____21st_____ day of July, 2006.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE